**BIRMINGHAM FIRE INSURANCE COMPANY OF PENNSYLVANIA, American International Adjustment Company, Inc., and AIG Claims Services, Appellants,**

v.

**AMERICAN NATIONAL FIRE INSURANCE COMPANY, Appellee.**

No. 06–96–00054–CV.

Court of Appeals of Texas, Texarkana.

Argued April 8, 1997.

Decided May 1, 1997.

Rehearing Overruled May 20, 1997.

Rehearing Overruled May 28, 1997.

---

E. Lawrence Merriman, Merriman, Patterson & Allison, Longview, for Appellant AIG Claims Services.

James D. Wise, Jr., Brown, Sims, Wise & White, Houston, for Appellant Birmingham Fire Ins. Co.

Jack W. Tucker, Jr., Tucker, Hendryx, Snyder & Slade, Houston, for Appellant American International Adjustment.

Herbert Boyland, Harbour, Kenley, Boyland & Smith, T. John Ward, Brown McCarrol & Oaks Hartline, Longview, David W. Holman, Holman, Hogan, DuBose & Townsend, Chris C. Pappas, Charles R. Dunn, Andrew J. Sarne, Dunn, Kacal, Adams, Pappas & Law, Houston, for Appellee American National.

Before CORNELIUS, C.J., and GRANT and ROSS, JJ.

## OPINION

ROSS, Justice.

Birmingham Fire Insurance Company of Pennsylvania ("Birmingham") and American International Adjustment Company, Inc., now known as AIG Claims Services, Inc., ("AIAC/AIGCS") appeal a judgment awarding American National Fire Insurance Company ("the appellee") $4 million for breach of contract and breach of the duty to settle under *G.A. Stowers Furniture Co. v. American Indem. Co.*, 15 S.W.2d 544 (Tex.Comm'n App.1929, holding approved). This case arose from a premises liability lawsuit against Avala of Texas ("Avala") and Intershop Real Estate Services, Inc. ("Intershop"). Avala owned and Intershop operated the Plymouth Park Shopping Center ("Plymouth Park") in Irving, Texas. For purposes of that lawsuit, Birmingham was the primary liability insurer of Avala and Intershop, and the appellee was the excess liability insurer. AIAC/AIGCS was a claims-handling company associated with Birmingham. After an excess judgment was entered against Avala and Intershop, the appellee filed this suit, alleging, *inter alia,* (1) that the appellants negligently failed to negotiate in good faith for settlement of the claim against Avala and Intershop, and (2) that Birmingham breached its insurance contract by fail-

ing to tender its full limits to the appellee. The appellants bring several points of error, and the appellee brings several cross-points. We reverse and render for the appellants on the *Stowers* cause of action. We modify the award of damages for breach of contract, ordering payment to the appellee of an additional $123,415.48 in supplemental payments, as well as an additional $26,109.98 in prejudgment interest. As modified, the breach-of-contract award is affirmed.

Around 9:00 p.m. on April 29, 1988, Patricia Garcia, who was seven months pregnant, was brutally murdered at a postal kiosk in the middle of Plymouth Park's parking lot. The killer was never apprehended. Garcia's husband, minor daughter, and parents ("Garcia plaintiffs") retained a noted Houston trial lawyer, Ronald Krist, to prosecute a premises liability suit against Avala and Intershop. All of the lawyers involved in the case, the appellee's employees, the mediators, and even some of the appellants' employees, evaluated the case as "very dangerous," involving a potential multimillion dollar verdict against Avala and Intershop. They were concerned about the horrible facts and great sympathy value of the case and were concerned that the plaintiffs had retained very able counsel in a favorable venue. Furthermore, discovery revealed that Plymouth Park, a very large shopping complex, had absolutely no security budget. In other words, there was a strong possibility of a large amount of punitive damages.

Because of an insurance policy giving it the sole right to defend and settle certain claims against Intershop and Avala, Birmingham had the right to take charge of the defense of the Garcia case. However, AIAC/AIGCS, a sister company of Birmingham, handled the entirety of the defense on behalf of Birmingham. Despite the dangerous nature of the case, the appellants dragged their feet in settlement negotiations. They would not offer above $250,000.00 in settlement, while the plaintiffs made various offers ranging from $3.25 to $5 million. The refusal to negotiate unnerved the appellee and Avala and Intershop, all of whom requested Birmingham to tender its limits so that the appellee could

attempt a settlement. The Garcia plaintiffs attempted to negotiate a settlement with the appellee, bypassing Birmingham, but the appellee refused to settle around Birmingham.

Apparently to the surprise of everyone except the appellants, the jury came back with a verdict in favor of Avala and Intershop. However, the trial judge determined that the jury's verdict was against the great weight of the evidence and therefore granted the plaintiffs' motion for new trial. Despite the result of the first trial, most of the participants continued to believe that the case involved a potentially huge verdict. Nevertheless, Birmingham still offered no more than $250,000.00 to settle the case. The second jury returned a verdict in excess of $10 million against Avala and Intershop. After the judgment, Birmingham tendered to the appellee $1 million, its claimed limits, and supplementary payments in excess of $400,-000.00. The judgment made relevant a contractual dispute between Birmingham and the appellee. Birmingham claimed that its limits were $1 million, whereas the appellee, stepping into the shoes of the insureds, claimed that Birmingham's limits were $2 or $4 million. Regardless, the appellee provided excess coverage for the next $10 million of liability. Therefore, the appellee negotiated a $7.9 million settlement with the Garcia plaintiffs.

The appellee sued the appellants, claiming that it suffered $6.5 million in damages as a result of the appellants' handling of the Garcia case. The appellee alleged negligence, breach of the duty of good faith and fair dealing, violations of the Texas Insurance Code, fraud, and misrepresentation. The trial judge eventually granted a directed verdict against the appellee on all claims except those premised on *Stowers*. The appellee also brought a breach-of-contract claim, styled as a declaratory judgment action, to recover the disputed $1 million from the primary policies covering Avala and Intershop. The contract cause of action was tried to the judge, while the *Stowers* cause of action was tried to the jury. The jury was not made aware of the contract dispute. After a lengthy trial, the jury found that the appellants negligently failed to negotiate in good faith for settlement of the case, but also found the appellee responsible for one third of its loss because it negligently disclosed information to the plaintiffs' counsel, thereby exposing the insured to greater liability. The jury found damages of $4 million. The trial judge found that Birmingham still owed $1 million under the terms of its contracts with Avala and Intershop. He therefore awarded the appellee $1 million from Birmingham. It appears that the trial judge subtracted $1 million, representing the amount that Birmingham owed as a result of its breach of contract, from the $4 million in *Stowers* damages. He then subtracted an additional $1 million based on the one-third comparative negligence determination and awarded the appellee $2 million against both of the appellants. The appellee also recovered attorney's fees on the contract action and prejudgment interest on the entire judgment.

We will first discuss issues related to the *Stowers* action. Then, we will discuss issues related to the contract action.

## I. STOWERS ACTION

### A. *Stowers Background*

Under the holding of *Stowers,* 15 S.W.2d at 547, an insured can state a cause of action against his insurer for negligently failing to accept a settlement demand from a third-party claimant.

> The *Stowers* duty is not activated by a settlement demand unless three prerequisites are met: (1) the claim against the insured is within the scope of coverage, (2) the demand is within the policy limits, and (3) the terms of the demand are such that an ordinarily prudent insurer would accept it, considering the likelihood and degree of the insured's potential exposure to an excess judgment.

*American Physicians Ins. Exch. v. Garcia,* 876 S.W.2d 842, 849 (Tex.1994). The insurer's duty of ordinary care also includes "investigation, preparation for defense of the lawsuit, trial of the case and reasonable attempts to settle." *Ranger County Mut. Ins. Co. v. Guin,* 723 S.W.2d 656, 659 (Tex.1987). However, "[i]n the context of a *Stowers* law-

suit, evidence concerning claims investigation, trial defense, and conduct during settlement negotiations is necessarily subsidiary to the ultimate issue of whether the claimant's demand was reasonable under the circumstances, such that an ordinarily prudent insurer would accept it." *American Physicians*, 876 S.W.2d at 849. The insurer has no duty "to accept a settlement demand in excess of policy limits or to make or solicit settlement proposals." *Id.* Although evidence of a formal demand is not an "absolute prerequisite" to a claim, "the *Stowers* remedy of shifting the risk of an excess judgment onto the insurer is inappropriate absent proof that the insurer was presented with a reasonable opportunity to prevent the excess judgment by settling within the applicable policy limits." *Id.*

*American Centennial Ins. Co. v. Canal Ins. Co.*, 843 S.W.2d 480, 483 (Tex.1992), held that an excess carrier may bring a *Stowers* action against a primary carrier. Because *American Centennial* was based upon the doctrine of equitable subrogation, it does not "impose new or additional burdens on the primary carrier...." *Id.*

The jury charge in this case asked whether the appellants were negligent in investigating, preparing to defend, trying, or negotiating in good faith for settlement of the Garcia case. The jury responded that the appellants were not negligent in investigating, preparing to defend, or trying the Garcia case. However, the jury found that the appellants negligently failed to negotiate in good faith for settlement of the case.[1] We reverse because the appellants had no duty to negotiate and were never presented with a within-limits demand.

### B. Duty to Negotiate

■ The appellants contend that "[t]he district court erred in submitting appellants' negligence to the jury and in entering judgment on the negligence action because, as a matter of law, appellants have no liability with respect to negotiation of settlement."

The appellants argue that because the *Stowers* doctrine governs only the acceptance or rejection of settlement offers, it does not impose any duty on an insurer with respect to negotiation. Therefore, the appellants argue, the court erroneously premised liability on negligent negotiation.

■ *American Physicians* holds that an insurer never has a duty to make settlement proposals. *American Physicians*, 876 S.W.2d at 849. "[A]n insurer cannot breach *a duty* by not tendering a settlement offer." *Id.* at 850 n. 17. After *American Physicians*, the focus in a *Stowers* lawsuit is solely on the reasonableness of the claimant's offer. *Id.* at 849. In fact, an insurer is not even obligated to solicit settlement offers from a third-party plaintiff. *Insurance Corp. of Am. v. Webster*, 906 S.W.2d 77, 79 (Tex.App.–Houston [1st Dist.] 1995, writ denied). Liability is thus premised purely on negligent failure to accept a reasonable offer; it cannot arise from a "failure to negotiate" because the insurer has no duty to undertake actions often required for negotiation, such as making a counteroffer. "Negotiation" is the "process of submission and consideration of offers until [an] acceptable offer is made and accepted." BLACK'S LAW DICTIONARY 1036 (6th ed.1990). Therefore, the trial court's jury charge allowed the jury to find the appellants negligent for failing to do that which they had no duty to do—engage in a give and take and exchange of offers with the Garcia plaintiffs. In fact, the charge instructed the jury to find liability if Birmingham negligently failed to make an offer. The charge stated: "You are further instructed that under the law of Texas, a primary insurance carrier is required to exercise ordinary care in considering whether it should offer the liability limits of its insurance policy...."

The appellee makes an argument that would re-introduce a duty to negotiate into the *Stowers* doctrine. The appellee notes this dicta in an *American Physicians* footnote: "A few courts have held insurers liable for a breach of the duty to settle in the

---

1. Actually, the judgment indicates a "No" answer to "negotiating in good faith for settlement of the case." However, the remaining answers are consistent with a "Yes" answer. Additional-

ly, the trial judge read a "Yes" answer into the record. The appellants do not contest the apparent typographical error in the judgment.

absence of a within-limits demand. However, these cases generally involve affirmative misconduct by the insurer to subvert or terminate settlement negotiations." *American Physicians*, 876 S.W.2d at 850 n. 17. After citing these cases, the court notes:

> Many of the cases above, and every other case the dissent cites, involve either affirmative misconduct in settlement negotiations, or an insurer that rejected an opportunity to settle within the policy limits. The reasoning in many of the cases above is actually consistent with our holding that an insurer cannot *breach a duty* by not tendering a settlement offer.

*Id.* at 851 n. 17. The appellee argues that *American Physicians* recognizes an exception to the requirement of a within-limits demand in cases in which the insurer engaged in "affirmative misconduct." In other words, a negligence finding against an insurer, even in the absence of a within-limits demand, would be justifiable if the insurer engaged in "affirmative misconduct" when negotiating.

Those states that have addressed the affirmative misconduct problem have adopted the exact rule rejected by *American Physicians*. Kent D. Syverud, *The Duty to Settle*, 76 VA. L.REV. 1113, 1166–68 (1990), was cited by the *American Physicians* majority as a discussion of the affirmative misconduct problem:

> As insurers become more experienced in creating a record to justify their behavior in settlement negotiations, courts adjust duty-to-settle doctrine to keep up, and the adjustments impose additional expenses. The duty of insurance companies to initiate settlement negotiations is one example. Under a few duty-to-settle decisions, liability cannot be imposed absent a reasonable settlement demand from the plaintiff. That rule gives insurers incentives to manipulate settlement negotiations so that plaintiffs do not make reasonable demands in cases where the insurer would prefer to go to trial. The manipulation can be more subtle than simply avoiding negotiations; the company can also refuse to make a counter-offer to an unreasonable demand (thus stalling a subsequent reasonable demand by a plaintiff who fears making un-

compensated concessions in bargaining), or it can cause negotiations to break down before they reach a reasonable settlement range by outraging or offending the plaintiff's attorney. *Many courts have understandably responded by holding that failure to initiate settlement negotiations or to solicit a reasonable demand, refusal to make a counteroffer, or contentious behavior in settlement negotiations may in some circumstances be a factor tending to show negligence or bad faith.*

> The problem with these rules, as with duty-to-settle standards generally, is their ambiguity when applied to particular settlement negotiations. It is not easy to predict whether a jury will regard a particular settlement demand, or a particular negotiating strategy, as reasonable or unreasonable. Juries and judges may err, with the result that appropriate conduct is punished and inappropriate conduct excused. Insurers may respond to the ambiguity by altering their behavior in every case, and not just in cases where duty-to-settle liability should attach. They may change bargaining strategy in every case, or marginally increase their assessment of the value of every case, rather than altering their behavior only in the cases where duty-to-settle liability is appropriate. As a result, insurers will accept some unreasonable, inefficient settlements, and they will sometimes avoid bargaining strategies that are in the interests of insureds. The resulting overpayment on such claims is a cost to all insureds. (footnotes omitted) (emphasis added).

Syverud's article suggests reasons that the *American Physicians* court did not intend to create an "affirmative misconduct" exception to the within-limits requirement. Such an exception would reintroduce chaos and uncertainty into the neat conceptual framework erected by *American Physicians*, for surely "affirmative misconduct" is just as slippery a standard as "ordinary prudence." Regardless, no case since *American Physicians* has even considered seizing the opportunity to create an "affirmative misconduct" exception. Therefore, we decline to hold that *American Physicians* creates an "affir-

mative misconduct" exception to the within-limits requirement. However, even if an "affirmative misconduct" doctrine existed, we would reverse. Although "negligence" would include "affirmative misconduct," it also would include more innocuous failures to exercise due care. Therefore, the court's charge erroneously permitted the jury to find negligence in failing to negotiate even if there was no "affirmative misconduct."

The appellee also argues that *American Physicians*, in which an insured sued his insurer, does not apply to a *Stowers* suit by an excess carrier against a primary carrier. In *American Physicians*, the court stated that its opinion does not "address the *Stowers* duty when a settlement requires funding from multiple insurers and no single insurer can fund the settlement within the limits that apply under its particular policy." *American Physicians*, 876 S.W.2d at 849 n. 13; *see also id.* at 855 n. 25. However, there is no reason to think that a primary carrier owes a greater duty to an excess carrier than to its insured. The excess carrier is equitably subrogated to the insured. Equitable subrogation "does not ... impose new or additional burdens on the primary carrier...." *American Centennial*, 843 S.W.2d at 483. No Texas case has seen fit to exempt excess carriers from the requirements of *American Physicians*. Such an exemption would, in fact, be inconsistent with the doctrine of equitable subrogation.

### C. Demand Within Policy Limits

The appellants also contend that "[t]he district court erred in submitting appellants' negligence to the jury and in entering judgment on the negligence action because there was no evidence of a demand within policy limits." It is undisputed that the Garcia

plaintiffs' lowest settlement offer was $3.25 million, which is not within Birmingham's policy limits.[2] However, the appellee argues that because Intershop, Avala, the appellee, and the Garcia plaintiffs all requested Birmingham to tender its limits, there was effectively a demand within policy limits. Because there is no material dispute regarding the underlying facts, it is our responsibility to determine as a matter of law whether there was a demand within the policy limits. *See, e.g., American Physicians*, 876 S.W.2d at 852–55.

■ The Garcia plaintiffs requested Birmingham to tender its limits. However, this request was not in the form of a settlement offer. Instead, the Garcia plaintiffs requested tender so that they could pursue settlement with the excess carrier. Because the Garcia plaintiffs did not promise to fully release Avala and Intershop in exchange for Birmingham's tender, the request did not trigger the *Stowers* duty. *American Physicians*, 876 S.W.2d at 848.

■ Avala, Intershop, and the appellee all requested Birmingham to tender its limits. The appellee argues that these requests qualified as within-limits demands triggering the *Stowers* duty. This argument is not supported by precedent. The *Stowers* duty is triggered only by a reasonable within-limits settlement demand that proposes to release the insured fully. *Texas Farmers Ins. Co. v. Soriano*, 881 S.W.2d 312, 314 (Tex.1994). Therefore, the duty is not triggered by a mere request to tender limits. The appellee's reading of the within-limits requirement would severely impede the primary carrier's right to protect its interests by defending or settling the suit. In any case with potential liability near the policy limits, the insured (or excess carrier) could,

**2.** Ronald Krist testified that he informally told counsel for Avala and Intershop, who had been hired by the appellants, that the case could settle for $2 to $3 million. However, at the same time, he sent the appellants a $5 to $6 million demand letter. The guardian ad litem for Mrs. Garcia's minor child told a representative of the appellants that he thought the case would settle between $1 and $2 million. However, the ad litem did not have authority to settle the case. An offer is "[a] proposal to do a thing or pay an amount, usually accompanied by an expected acceptance, counter-offer, return promise or act." BLACK'S LAW DICTIONARY 1081 (6th ed.1990). Neither of these suggestions by the plaintiffs could have been accepted as an offer by the appellants. Instead, these were back-channel suggestions to aid the defendants in making a counteroffer. As a result, we cannot say that they constitute demands within the policy limits. Apparently recognizing this, the appellee does not argue that these suggestions were demands or offers.

by requesting tender of policy limits, demand that the primary insurer give up defense of the case. *See also American Physicians,* 876 S.W.2d at 865 (Hightower, J., dissenting) ("Under the court's analysis, an insurer has no duty to act as an ordinarily prudent person in business management to make reasonable attempts to settle or even to act in good faith until it receives a formal settlement demand within policy limits *from the plaintiff*" (emphasis added)).

To support its argument, the appellee relies on *American Centennial,* 843 S.W.2d 480, the case in which the Texas Supreme Court first sanctioned *Stowers* suits by excess carriers against primary carriers. The appellee looks to the facts presented in the lower court opinion, *American Centennial Ins. Co. v. Canal Ins. Co.,* 810 S.W.2d 246, 249–50 (Tex.App.–Houston [1st Dist.] 1991), *aff'd in part & rev'd in part,* 843 S.W.2d 480 (Tex.1992). The appellee notes that in *American Centennial,* the insured gathered together all of his insurers and demanded that they tender their policy limits. The appellee wishes us to infer that the supreme court concluded that this was a within-limits demand meeting the requirements of *Stowers.* There is no basis for such a conclusion. *American Centennial* did not address the issue of whether a within-limits demand had been made. Both opinions are silent as to whether the third-party claimant ever made a within-limits demand on the primary carrier. In fact, the case premised liability on a theory that the primary carrier's negligent handling of the case prevented a beneficial settlement. In other words, *American Centennial* was decided under the regime of *Ranger County,* 723 S.W.2d 656, which implicitly permitted such claims without a within-limits demand by the third-party claimant. Because *Ranger County* was cabined significantly by *American Physicians, American Centennial* cannot stand for the proposition that an insured can trigger the *Stowers* duty by demanding that the primary carrier tender its limits.

The appellee could argue that its request that Birmingham tender its limits converted the above-limits settlement demand into a within-limits settlement demand. The *American Physicians* majority stated that:

> We do not reach the question of when, if ever, a *Stowers* duty may be triggered if an insured provides notice of his or her willingness to accept a reasonable demand above the policy limits, and to fund the settlement, such that the insurer's share of the settlement would remain within the policy limits.

*American Physicians,* 876 S.W.2d at 849 n. 13.

*American Physicians* cites Robert E. Keeton, *Liability Insurance and Responsibility for Settlement,* 67 HARV. L.REV. 1136, 1148 (1954), which states:

> If the claimant offers to settle for a figure higher than policy limits, the insured may (in jurisdictions requiring the company to give equal, or more, consideration to the insured's interests) invoke the benefits of the doctrine of excess liability by offering to pay that part of the proposed settlement figure which is in excess of policy limits; as the matter is presented to the company in such a situation, it has an opportunity to settle by paying out a sum not exceeding policy limits. (footnote omitted).

One Texas case has adopted the rule suggested by Keeton. In *State Farm Lloyds Ins. Co. v. Maldonado,* 935 S.W.2d 805, 814–16 (Tex.App.–San Antonio 1996, n.w.h.), the third-party claimant offered to settle the case if he received the insurer's limits ($300,-000.00), plus $1 million from the insured. The insurer refused the offer, and after a large verdict against the insured, the third-party claimant, on assignment from the insured, pursued a *Stowers* action against the insurer. The insurer argued that *Stowers* was inapplicable because it had never received a within-limits settlement offer. The court disagreed:

> The bifurcated nature of the demand was clearly communicated to all involved—$1 million from [the insured] and $300,000, or policy limits, from State Farm. Accordingly, the record supports a finding that everyone involved, including State Farm and [the insured's attorney], understood the mechanics behind [the plaintiff's] $1.3 million demand. That is, that an offer of

policy limits settlement was being made to State Farm if [the insured] would pay $1 million out of his own pocket.

*Id.* at 815.

■ The dissent in *Maldonado* points out that the majority seems to be engaging in a legal fiction to skirt the within-limits requirement, without any precedential basis. *Id.* at 825–26 (Rickhoff, J., concurring and dissenting). Regardless, the appellee's case is much weaker than *Maldonado*. The appellee never tied its request that Birmingham tender its limits to a specific settlement offer by the plaintiffs. In fact, it is quite possible that the appellee would not have settled immediately had Birmingham tendered its limits. The appellee may have wished to negotiate a more favorable settlement, using Birmingham's $1 or $2 million as an inducement to the plaintiffs. Additionally, the plaintiffs never made a bifurcated offer. Birmingham had no obligation to agree to an arrangement that would not fully release the insured. *American Physicians,* 876 S.W.2d at 848. Therefore, we reverse the *Stowers* award and render for the appellants because the appellants had no duty to negotiate or accept a settlement offer above the policy limits. Because we reverse the *Stowers* award on these grounds, we need not discuss any of the other points and cross-points associated with the *Stowers* award.

## II. CONTRACT CLAIM

### A. Applicability of Policy GL 647–01–60

■ Birmingham contends that "[t]he district court erred in entering judgment that there was duplicate territorial coverage under two Birmingham insurance policies for a single Texas occurrence, affording the insured double coverage exceeding $1 million."

It is undisputed that Birmingham's policy number GL 647–01–53 covered Intershop and applied to the occurrence at Plymouth Park. Through Intershop, it also applied to Avala. This policy provided up to $1 million coverage per occurrence. The dispute over limits is really a dispute over the applicability of a second policy, number GL 647–01–60,

also issued by Birmingham and covering Intershop and Avala up to $1 million per occurrence. Birmingham contends that this second policy does not cover occurrences at Plymouth Park. The trial judge disagreed, finding that both policies simultaneously covered occurrences at Plymouth Park. Therefore, Birmingham's limits were $2 million.

The disputed policy provides:

This insurance applies only to "bodily injury" and "property damage" which occurs during the policy period. The "bodily injury" or "property damage" must be caused by an "occurrence." The "occurrence" must take place in the "coverage territory."

The policy defines "coverage territory" to include "the United States of America." The appellee argues that because Texas is part of the United States, policy GL 647–01–60 covers Plymouth Park. "Having lost the War of Northern Aggression, sometimes mislabeled the Civil War, Texas remains a part of the United States." *El Paso Reyco, Inc. v. Malaysia British Assurance,* 808 S.W.2d 529, 530–31 (Tex.App.–El Paso 1991), *rev'd on other grounds,* 830 S.W.2d 919 (Tex.1992).

■ Birmingham argues that we should look to the circumstances surrounding the making of the insurance contracts to determine that policy GL 647–01–53 applies only to Texas occurrences and policy GL 647–01–60 applies only to occurrences outside Texas. First, Birmingham notes that Intershop's excess policy references an underlying commercial general liability policy with a $1 million per-occurrence limit. Birmingham argues that the appellee therefore originally understood that only one Birmingham policy applied to each of Intershop's locations.

Second, Birmingham notes that the $2 million aggregate limit under both policies applied separately to "each of [the insured's] 'locations' owned by or rented to [the insured]." Both policies included a "Schedule of Insureds (*sic*) Locations." Policy GL 647–01–53 listed only Texas locations, including Plymouth Park. Policy GL 647–01–60 listed only locations outside Texas.[3] Policy GL

---

**3.** Actually, Plymouth Park is twice listed in policy GL 647–01–60 as an "additional insured," al-

though it is not listed on any separate endorsement page. Interestingly, none of the parties

647–01–53 included an endorsement entitled "Texas changes," apparently to bring the policy into line with state law. Similarly, policy GL 647–01–60 included "changes" for several states other than Texas, although it did not include changes for every state represented on the Schedule of Locations. Birmingham therefore argues that "the policies unambiguously express territorial exclusivity, with [GL 647–01–53] applying only to Texas, and [GL 647–01–60] applying only to locations outside Texas." Birmingham further argues that any other construction would render meaningless policy references to "locations."

*National Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex.1995), sets out rules governing interpretation of insurance policies:

> Insurance policies are controlled by rules of interpretation and construction which are applicable to contracts generally. The primary concern of a court in construing a written contract is to ascertain the true intent of the parties as expressed in the instrument. If a written contract is so worded that it can be given a definite or certain legal meaning, then it is not ambiguous. Parol evidence is not admissible for the purpose of creating an ambiguity.
>
> If, however, the language of a policy or contract is subject to two or more reasonable interpretations, it is ambiguous. Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered. Only where a contract is first determined to be ambiguous may the courts consider the parties' interpretation and admit extraneous evidence to determine the true meaning of the instrument. (citations omitted).

Birmingham concedes that policy GL 647–01–60 is unambiguous. Birmingham urges that we examine policy GL 647–01–53 and the American National policy to determine that policy GL 647–01–60 unambiguously does not cover Plymouth Park. The appellee argues that an examination of the other insurance policies would violate the parol evidence rule. In response, Birmingham contends that the court may examine the other policies in order to ascertain the "circumstances present when the contract was entered."

Birmingham's argument is an attempt to circumvent the parol evidence rule by importing an examination of "surrounding circumstances" into standard contract interpretation. However, an examination of precedent reveals that "surrounding circumstances" are only examined to determine whether a contract is latently ambiguous. For example, *National Union* concerned a dispute over whether pollution exclusions were ambiguous. The trial court granted summary judgment for the insurer before the insured had the opportunity to conduct discovery in hopes of finding evidence that would reveal a latent ambiguity. *Id.* at 519. The court of appeals reversed, holding that the insured had not been given sufficient time to discover evidence which would reveal a latent ambiguity. The supreme court then reversed the judgment of the court of appeals because all the relevant "surrounding circumstances" were already known. The court noted:

> The facts relating to the accident, the release of hydrofluoric acid as a result of that accident, and the personal injury and property damage claims allegedly resulting from that release appear to be fully developed. The surrounding circumstances present when the contract was entered into were amply established for the purpose of determining whether an ambiguity exists in this case on these facts. The discovery sought by CBI is not necessary for the application of the contract to its subject matter, but rather goes to the issue of the parties' interpretation of the "absolute pollution exclusion." The court of appeals erred in holding, in effect, that CBI must be allowed an opportunity to

discussed this issue at trial or in their appellate briefs. At oral argument, counsel for the appellants stated that there are many locations called "Plymouth Park" throughout the United States.

Because Plymouth Park in Irving, Texas, is not excluded, it is presumably covered by policy GL 647–01–60.

discover parol evidence going to the parties' intentions in order to create a latent ambiguity.

*Id.* at 521. The rule applied in *National Union* was stated succinctly in *Murphy v. Dilworth,* 137 Tex. 32, 151 S.W.2d 1004, 1005 (1941), "if the meaning of the language used in a written contract becomes uncertain when an attempt is made to apply it to the subject matter of the contract, though not otherwise uncertain, parol evidence is permissible to aid in making the application." This statement of the law has become known as the "latent ambiguity" rule. *Bache Halsey Stuart Shields, Inc. v. Alamo Sav. Ass'n,* 611 S.W.2d 706, 708 (Tex.Civ.App.–San Antonio 1980, no writ).

■ Courts should always examine "surrounding circumstances" or "the subject matter of the contract" to determine if a contract is latently ambiguous. But as *National Union* noted, the intent of the parties is not a circumstance to be examined to develop latent ambiguity. Furthermore, "the expressions of the parties simultaneous with the making of the contract are never treated as 'surrounding circumstances.'" *Remington Rand, Inc. v. Sugarland Indus.,* 137 Tex. 409, 153 S.W.2d 477, 484 (1941). In this case, the trial court properly had before it the subject matter to which the appellee wished to apply policy GL 647–01–60: the murder of Patricia Garcia at Plymouth Park Shopping Center. Because the other policies did not shed light on the subject matter, they were irrelevant to the trial judge's determination of whether policy GL 647–01–60 was ambiguous. Therefore, the court would have violated the parol evidence rule had it considered the other policies. Birmingham's argument has nothing to do with latent ambiguity. Birmingham insists that the trial court should have considered parol evidence to establish an *unambiguous* construction of the disputed policy. In making this argument, Birmingham cites the latent ambiguity rule out of context.

Birmingham also argues that "[i]t is universally stated that in determining, in the first instance, whether an ambiguity exists, Texas courts look to the entirety of the insurance agreements and interpret them as a whole. *Barnett v. Aetna Life Ins. Co.,* 723 S.W.2d 663, 665 (Tex.1987)." Not only has this purported rule not been "universally stated," so far as we can tell, it has never been stated. *Barnett* is entirely inapposite to the proposition.

Birmingham then argues that policies GL 647–01–53 and GL 647–01–60 are actually one single insurance policy. Birmingham cites *Balderama v. Western Cas. Life Ins. Co.,* 825 S.W.2d 432 (Tex.1991). In *Balderama,* the court concluded that two documents constituted one policy of insurance. One of the documents could not stand alone as an insurance policy because it lacked a policy schedule or separate policy number. In contrast, the two Birmingham policies can both stand alone. In fact, since they contain nearly identical provisions, they must stand alone if they are to stand, for neither policy would add much to the other if they were construed as one contract. Therefore, this argument, too, is unavailing.

Finally, Birmingham makes an argument not based on incorporating outside documents. Birmingham notes that the general aggregate limits in policy GL 647–01–60 apply separately to each location. Birmingham argues that if the policy covers the entire United States, it would be pointless for a limit to reference specific locations. However, if the policy covers only "locations," it would be similarly pointless for the "coverage territory" to be the entire United States. At most, Birmingham's argument renders the policy patently ambiguous. By not briefing the point, Birmingham has waived any argument that the trial court erred in finding that the policy was unambiguous. *Lewis v. Texas Utils. Elec. Co.,* 825 S.W.2d 722, 726 (Tex. App.–Dallas 1992, writ denied). Therefore, this point of error is overruled.

## B. Counterclaim on Supplementary Payments

■ Birmingham contends that "[t]he district court erred in denying Birmingham's counterclaim recovery based on appellee misapplying 'supplementary payments' of Birmingham to the settlement of the underlying case." This point of error presents an issue of first impression: When a primary carrier

makes supplementary payments related to a judgment against its insured, must the excess carrier return the payments if it settles the claim for an amount less than the judgment?

The supplementary payments provisions of policy GL 647–01–53 obligate Birmingham to pay, among other things:

5. All costs taxed against the insured in the "suit."

6. Pre-judgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any pre-judgment interest based on that period of time after the offer.

7. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

Because of these provisions, Birmingham paid to American National $457,955.48 in addition to its purported $1 million limit. Payment was made on April 20, 1992, between the judgment and the settlement. $457,955.48 equals the sum of $268,493.16 prejudgment interest on $1 million, $47,858.91 post-judgment interest accrued over 21 days after the judgment and before Birmingham tendered its limits, $134,333.45 attorney ad litem fees taxed to the insured, and $7,269.96 other costs taxed to the insured.

Birmingham argued in its counterclaim that it was entitled to return of the supplementary payments once settlement was made because there was no longer a "judgment" triggering the duty to make the payments. The trial judge denied this counterclaim, and Birmingham now appeals.

Birmingham relies almost entirely on *Travelers Indem. Co. v. Edwards*, 462 S.W.2d 533 (Tex.1970). *Edwards* involved two automobile liability policies issued to Norman E. McVean by Travelers Indemnity Company and Mission Insurance Company. McVean allowed William T. Edwards, III, to drive his car. Edwards was involved in a wreck in which several people died or were injured. Thereafter, Travelers and Mission disputed whether their policies covered Edwards. Edwards settled with the third-party claimants, then sued Travelers and Mission. The trial court rendered judgment for Edwards. The court of appeals affirmed, but reformed the judgment to allow Edwards to recover interest under Travelers' supplementary payments clause. The clause obligated Travelers:

To pay, in addition to applicable limits of liability:

(a) all expenses incurred by the company, all costs taxed against the insured in any such suit and all interest on the entire amount of any judgment therein which accrues after entry of the judgment and before the company has paid or tendered or deposited in court that part of the judgment which does not exceed the limit of the company's liability thereon; . . . .

*Id.* at 535–36 (emphasis omitted). The supreme court reversed the award of supplementary payments:

"Such suit" in the above quoted clause refers to any suit against an insured and the clause goes on to obligate the insurer to pay costs and interest on a judgment against the insured. This record does not indicate that any judgment was entered against an insured. Edwards, the insured here, has settled the claims in his behalf. The only law suit involved is Edwards against the *insurers*. The only judgment involved is against Travelers and Mission. . . . Since the insured has settled and no showing has been made that the settlements were reduced to judgment, Travelers owes him nothing under the Supplementary Payments Clause. Therefore, it was error to hold that Travelers owes interest on the entire judgment.

*Id.* at 536.

The appellee notes that *Edwards* is of limited utility because in this case, unlike in *Edwards*, there *was* a judgment, as well as a settlement. Therefore, *Edwards* does not answer the fundamental question: Does a subsequent settlement obligate an excess insurer (or, for that matter, an insured) to return supplementary payments which it was

entitled to retain had it merely paid the judgment?

In *Providence Washington Ins. Co. v. Fireman's Fund Ins. Cos.*, 778 P.2d 200 (Alaska 1989), an excess judgment was entered against the insured. The primary carrier tendered to the excess carrier its $1 million limits, but refused to tender any postjudgment interest. The excess carrier then concluded a settlement with the third-party claimant for less than the judgment amount. Afterward, the excess carrier claimed that the primary carrier owed approximately $1.4 million in postjudgment interest accrued between the entry of judgment and the primary carrier's tender of its limits. The primary carrier's supplementary provision on postjudgment interest was essentially identical to the provision contained in policy GL 647–01–53. The trial court entered summary judgment for the excess carrier.

The Alaska Supreme Court affirmed the trial court's judgment. It determined that the primary carrier's supplementary payments clause unambiguously obligated it to pay postjudgment interest. Apparently, the subsequent settlement, which technically erased the insured's obligation to pay postjudgment interest to the third-party claimant, had no effect on the primary carrier's responsibility to pay an amount equal to the postjudgment interest provided for in the superseded judgment.

*Providence Washington*'s analysis is sketchy, but its result is sound. The supplementary payments provisions on costs and postjudgment interest unambiguously give the insured the unfettered right to payment for costs and postjudgment interest. Essentially, Birmingham is asking us to limit its obligation under the supplementary payments provisions of the insurance policy without any textual basis for such a limitation.

The prejudgment interest provision is somewhat different, however, because unlike the other provisions, it is tied to Birmingham's payment of part of the judgment. Birmingham argues that this provision cannot be triggered when there is no longer a judgment in legal effect. However, the judgment was in effect when Birmingham tendered.

In other words, at that point, Birmingham had a contractual obligation to tender prejudgment interest payments, just as it had a contractual obligation to tender its limits. Birmingham is asking, in effect, to be declared a third-party beneficiary of the settlement contract between the appellee and the Garcia plaintiffs. However, because there is no evidence that the appellee and the Garcia plaintiffs intended to benefit Birmingham by making the settlement contract, we cannot find that the appellee had a duty to provide Birmingham a slice of the settlement bargain. RESTATEMENT (SECOND) OF CONTRACTS § 302 (1981).

■ Even if Birmingham's interpretation of its supplementary payments clauses is "reasonable," we resolve interpretational uncertainty in favor of the insured. *State Farm Fire & Cas. Co. v. Reed*, 873 S.W.2d 698, 699 (Tex.1993). This principle especially applies when we must decide who should receive the windfall of a settlement negotiated by the insured (or the excess carrier, as the insured's stand-in). To adopt Birmingham's argument would contravene the supreme court's oft-stated goal of encouraging settlements. *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 9 (Tex.1991). An excess carrier or insured would be discouraged from settling if it was required to return all supplementary payments before realizing any benefit from a compromise. In fact, if the amount of supplementary payments was greater than the amount saved through settlement, the excess carrier or insured would actually lose money by settling. Therefore, this point of error is overruled.

### C. Amount of Supplementary Payments

■ The appellee's third cross-point contends that "[t]he district court erred in failing to award the correct amount of supplemental payments." The appellee argues that Birmingham owes four years worth of postjudgment interest on the entire Garcia judgment. The appellee claims that this argument entitles it to an additional recovery in excess of $6 million.

The appellee's argument is based on *Western Cas. and Sur. Co. v. Preis*, 695 S.W.2d

579 (Tex.App.–Corpus Christi 1985, writ ref'd n.r.e.), which held that the amount of postjudgment interest owed by the primary insurer, as defined in a supplementary payments clause nearly identical to that in policy GL 647–01–60, continues to increase until the primary insurer pays the interest in full, even after the excess insurer fully satisfies the judgment. In so ruling, the court set forth a "pivotal issue": "who is the supplementary payment provision of the policy designed to benefit and protect?" *Id.* at 586. Answering the question, the court stated: "it is clear that the very basis for making the insurance company liable for interest *on the entire judgment* is to protect the insured from liability for additional interest and/or costs incurred because of actions taken by the insurer." *Id.* The court concluded that the excess carrier's payment of the judgment "merely acted to transfer the right of collection of this accruing interest to [the excess carrier]." *Id.* at 587.

The appellee argues that because Birmingham never tendered its full limits, its liability for postjudgment interest continued to accrue under the holding of *Western Casualty.* The settlement between the Garcia plaintiffs and American National, so the argument goes, does not affect the accrual of postjudgment interest. As applied to this case, *Western Casualty* is wrong. Postjudgment interest accrues until "the day the judgment is satisfied." Tex.Rev.Civ. Stat. Ann. § 5069–1.05, § 3(a) (Vernon Supp.1997). "The satisfaction of a judgment refers to compliance with, or fulfillment of, the mandate thereof." 48 Tex.Jur.3d *Judgments* § 570 (1986). The Garcia judgment was satisfied when the Garcia plaintiffs settled with the appellee. Therefore, at that point, postjudgment interest ceased to accrue. *See*

*also* Garcia Judgment (providing that postjudgment interest would continue to accrue until the judgment was paid). As a result, we cannot now require Birmingham to pay "postsatisfaction interest." However, Birmingham still owes postjudgment interest from April 14, 1992, the day after it tendered its limits, to May 26, 1992, the date of the settlement.[4] Because Birmingham never tendered its limits under policy GL 647–01–60, postjudgment interest continued to accrue until settlement. Therefore, we must calculate the postjudgment interest for April 13 to May 26, 1992, on all amounts due under the Garcia judgment, at the rate of 10 percent compounded annually, as provided for in the Garcia judgment. That amount is $123,415.48, which equals $10,475,965.06 (the sum of actual damages, punitive damages, prejudgment interest, the ad litem fee, and other taxable court costs) multiplied by 10 percent annual interest over 43 days. Additionally, the appellee is entitled to prejudgment interest on this amount. If we were to award prejudgment interest consistent with the trial court's judgment, we would use a 10 percent simple rate. However, that award would be erroneous. Tex.Rev.Civ. Stat. Ann. art. 5069–1.03 (Vernon 1987) provides, "[w]hen no specified rate of interest is agreed upon by the parties, interest at the rate of six percent per annum shall be allowed on all accounts and contracts ascertaining the sum payable, commencing on the thirtieth (30th) day from and after the time when the sum is due and payable." Damages on a contract are to be calculated at a 10 percent rate unless "the contract provide[s] the conditions upon which liability depends and ... fix[es] 'a measure by which the sum payable can be ascertained with reasonable certainty.'" *Perry Roofing Co. v. Olcott*, 744 S.W.2d 929, 930 (Tex.1988)

---

4. Actually, Birmingham's original payment of postjudgment interest was insufficient. Birmingham tendered $47,858.91, which equals 10 percent interest for 21 days on the actual damages, punitive damages, and ad litem fees. This calculation was defective in three ways. First, 43 days passed from the signing of the final judgment to Birmingham's tender of its limits. Second, Birmingham did not include postjudgment interest on prejudgment interest. *Sisters of Charity v. Dunsmoor*, 832 S.W.2d 112, 119 (Tex.App.–Austin 1992, writ denied) (holding that postjudgment interest accrues on prejudgment interest). Third, Birmingham did not include postjudgment interest on $7,269.96 of taxable costs. Tex.Rev. Civ. Stat. Ann. art. 5069–1.05, § 2 (Vernon Supp. 1997) (providing that postjudgment interest accrues on taxable costs). As a result, Birmingham should have paid $123,415.48 postjudgment interest. However, the appellee did not challenge the sufficiency of Birmingham's payment through April 13, 1992, either at the trial court level or on appeal. Therefore, the argument is waived.

(quoting *La Sara Grain Co. v. First Nat'l Bank,* 673 S.W.2d 558, 567 (Tex.1984)). Even when the court must look outside an insurance policy to determine the amount due under the policy, the amount is "readily ascertainable" so long as the policy clearly sets forth a method of determining the insurer's liability.

> [I]t is not necessary ... that the contract shall itself establish a fixed liability in a definite amount as of a date certain. It is sufficient ... if the contract provides the conditions upon which liability depends and fixes a measure by which the sum payable can be ascertained with reasonable certainty, in light of the attending circumstances.

*Miles v. Royal Indem. Co.,* 589 S.W.2d 725, 736 (Tex.Civ.App.–Corpus Christi 1979, writ ref'd n.r.e.) (emphasis omitted) (quoting *Federal Life Ins. Co. v. Kriton,* 112 Tex. 532, 249 S.W. 193, 195 (1923)). Because policy GL 647–01–60 sets forth a method of computing supplementary payments from known liabilities, prejudgment interest on those known liabilities should be calculated at a six percent rate. Therefore, the prejudgment interest should be determined by multiplying $123,415.48 by six percent over three years and 192 days, which equals $26,109.98.[5]

Additionally, because policy GL 647–01–60 covered occurrences at Plymouth Park and contained supplementary payments clauses identical to those in GL 647–01–53, the appellee was entitled to recover prejudgment interest on an additional $1 million. The appellee has pointed out the applicability of GL 647–01–60 and has noted that Birmingham erroneously did not make supplementary payments based on GL 647–01–60. However, the appellee's sole argument at trial and on appeal has been that Birmingham failed to make the required *postjudgment* interest payments. Therefore, the appellee has waived the prejudgment interest argument.

### D. Entitlement to Prejudgment Interest

The appellants contest the appellee's right to receive any prejudgment interest. They argue that since the appellee was negligent itself, equitable principles preclude an award of prejudgment interest. This argument appears to apply only to the *Stowers* award and so is mooted by our reversal of that award. Regardless, because the appellee's damages had accrued by the time of judgment, the trial court did not have discretion not to award prejudgment interest. *Graco Robotics, Inc. v. Oaklawn Bank,* 914 S.W.2d 633, 646 (Tex.App.–Texarkana 1995, writ dism'd); *see Crum & Forster, Inc. v. Monsanto Co.,* 887 S.W.2d 103, 152–53 (Tex. App.–Texarkana 1994, no writ) (noting that the *Cavnar v. Quality Control Parking, Inc.,* 696 S.W.2d 549 (Tex.1985) scheme for awarding prejudgment interest has been expanded to cover all cases not covered by statute). Furthermore, there is no precedent for the proposition that a negligent plaintiff cannot recover prejudgment interest. Therefore, this point of error is overruled.

### E. Compounding

The appellee contends that "[t]he district court erred in failing to award prejudgment interest at 10 percent, compounded *daily.*" Because prejudgment interest on the appellee's contract claim is properly calculated applying the formula in TEX.REV.CIV. STAT. ANN. art. 5069–1.03, this cross-point can apply only to the recovery on the *Stowers* claim. Because we reverse the *Stowers* award, we decline to address this issue.

### F. Attorney's Fees on Contract Action

The appellants contend that "[t]he district court erred in awarding attorneys' fees to appellee because it did not prevail on declaratory relief." The trial judge awarded the appellee $200,000.00 attorney's fees on the contract action, pursuant to a stipulation in

---

**5.** Because policy GL 647–01–60 sets forth on its face $1 million of coverage in case of liability over $1 million, the trial court also erred in awarding 10 percent interest on that amount. *St. Paul Ins. Co. v. Rakkar,* 838 S.W.2d 622, 631–32 (Tex.App.–Dallas 1992, writ denied) (holding that postjudgment interest is six percent against an insurer that breaches a contract by failing to

pay the insured the full amount of his policy coverage). However, the appellants do not argue that the trial judge erred by awarding 10 percent interest on the $1 million breach-of-contract judgment. Therefore, they have waived this argument. Instead, the appellants argue solely that the trial judge erred by awarding 10 percent interest on the *Stowers* recovery.

which the parties agreed before the verdict that $200,000.00 was a reasonable amount.

Birmingham first argues that because the jury found comparative negligence in the *Stowers* action, the appellee cannot recover attorney's fees on the contract action because it has unclean hands. This argument is without merit. Not only did the appellee not have "unclean hands," but its comparative negligence had nothing to do with the contract action. Birmingham's second argument is also weak. Birmingham argues that courts disfavor awarding attorney's fees in bad faith (and presumably *Stowers*) claims. This proposition is irrelevant because Birmingham concedes that in this case, the court did not award attorney's fees on the *Stowers* claim.

Birmingham's second argument is that the appellee was not entitled to attorney's fees because the appellee did not "prevail" on its contract claims. Birmingham notes that the appellee originally claimed that Birmingham's limits totaled $4 million ($2 million on each policy). TEX. CIV. PRAC. & REM.CODE ANN. § 37.009 (Vernon 1986) allows a trial judge to award "reasonable and necessary" attorney's fees on a declaratory judgment action when such an award would be "equitable and just." The award may not be reversed absent a clear showing of abuse of discretion. *Oake v. Collin County*, 692 S.W.2d 454, 455 (Tex.1985). "An award of attorney's fees is not limited to the prevailing party." *District Judges v. Commissioners Court*, 677 S.W.2d 743, 746 (Tex.App.–Dallas 1984, writ ref'd n.r.e.). Therefore, this point of error is overruled.

## G. Appellate Costs

Finally, the appellee prays for recovery of its costs on appeal. Pursuant to the trial court judgment, the appellee will recover $25,000.00 appellate attorney's fees. Beyond that, we have determined that each party should pay its own costs.

In summary, we reverse and render for the appellants on the *Stowers* award. We modify the award of damages for breach of contract to add $123,415.48 in supplemental payments, as well as an additional $26,109.98

prejudgment interest. As modified, the breach-of-contract award is affirmed.