COURT OF APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
 
NO. 2-02-361-CV
 
  
CHRISTINA TEADORA VARRASSO 
LOAIZA                              APPELLANT
 
V.
 
ESTEBAN ANTONIO LOAIZA                                                      APPELLEE
  
------------
 
FROM THE 231ST 
DISTRICT COURT OF TARRANT COUNTY
 
------------
 
OPINION
 
------------
        Christina 
Teadora Varrasso Loaiza appeals from the trial court’s decree granting her and 
Esteban Antonio Loaiza a divorce and dividing the marital estate. In one point, 
appellant argues that the trial court abused its discretion by failing to make a 
just and right division of the community estate. Specifically, appellant 
contends that the trial court erred by finding that she failed to prove by a 
preponderance of the evidence that appellee wasted community assets, breached 
fiduciary duties owed to appellant, or committed fraud on the community. 
Additionally, appellant argues that the trial court erred in characterizing 
appellee’s post-divorce guaranteed payments under his baseball contract with 
the Toronto Blue Jays as his separate property. We affirm.
FACTS
        Appellant 
married appellee, a major league baseball player, in October of 1998. Prior to 
the wedding, appellee’s team traded him to the Texas Rangers. Two weeks before 
his wedding to appellant, appellee began an affair with 19-year-old Ashley 
Esposito, a nanny employed by one of his teammates. A few days before the 
wedding, Ashley began making harassing phone calls to appellant. When 
confronted, appellee denied having an affair. Ashley continued calling 
appellant, as well as appellant’s mother and sisters, after the parties’ 
marriage and during the 1999 baseball season, telling them she and appellee were 
having an affair and threatening to harm appellant.
        In 
January of 2000, appellant and appellee bought a lot and began building a home 
in Pennsylvania. While the home was being built, appellee left for Texas to 
begin spring training with the Texas Rangers. The threatening calls from Ashley 
began again. In July of 2000, while appellant was at a wedding in Mexico, 
appellee met Ashley at a resort in Arizona. Appellee also invited his cousins 
and paid for everyone’s airfare and hotel. During this rendevous, Ashley told 
appellee that she was pregnant with his child.
        Shortly 
after appellee’s trip with Ashley, he was traded to the Toronto Blue Jays. 
Appellant and appellee moved to Toronto for the remainder of the 2000 season. 
Around the same time, appellee began making plans to divorce appellant. He 
purchased Ashley a $64,000 Lexus and bought both his brother and sister new cars 
at about $30,000 each. On August 31, 2000, appellee filed for divorce in Tarrant 
County, Texas, but did not tell appellant that he was divorcing her. Instead, he 
told her he would return home to her in Pennsylvania after the last game of the 
2000 season. Instead, he flew to DFW and went shopping for a home with Ashley in 
Texas.
        Two 
days after appellee’s arrival at DFW, he and Ashley both signed papers to 
lease a house, with an option to purchase it in the future. Appellee used 
$75,000 in community funds as the down payment for the purchase option. Several 
days later, appellee’s attorney forwarded the divorce papers to appellant. In 
November and December of 2000, appellee purchased several Rolex watches for 
teammates, a car for his mother, and two cars for himself all totaling 
approximately $184,000.
        During 
his separation from appellant, appellee signed a contract with the Toronto Blue 
Jays on February 27, 2001. The contract “guaranteed” appellee payments of $4 
million in 2001 and $5.8 million in 2002. Appellant continued his affair with 
Ashley, who had his baby in March 2001. Appellee paid all her medical bills. 
Additionally, appellee paid Ashley’s mother $72,000 a year to care for the 
baby during the day.
        At 
trial, the court ruled that the parties were divorced as of April 30, 2002. The 
trial court found that appellant did not prove by a preponderance of the 
evidence that appellee wasted community assets, breached fiduciary duties owed 
to appellant, or committed fraud on the community. Additionally, the trial court 
determined that the post-divorce payments under the Toronto Blue Jays contract 
were appellee’s separate property because he was required to complete his 
services as a baseball player before he was entitled to the money.
STANDARD OF REVIEW
        A 
trial court has broad discretion in dividing the marital estate, and we presume 
the trial court exercised its discretion properly. Murff v. Murff, 615 
S.W.2d 696, 698-99 (Tex. 1981). In dividing the parties’ community estate, the 
trial court shall order a division of the property that it deems just and right, 
having due regard for the rights of each party. Tex. Fam. Code Ann. § 7.001 (Vernon 
1998). The party who complains of the trial court’s division of property must 
demonstrate from evidence in the record that the division was so unjust that the 
trial court abused its discretion. Zeptner v. Zeptner, 111 S.W.3d 727, 
734 (Tex. App.—Fort Worth 2003, no pet.) (op. on reh'g); Pletcher v. Goetz, 
9 S.W.3d 442, 446 (Tex. App.—Fort Worth 1999, pet. denied) (op. on reh’g).
        The 
trial judge may order an unequal division of marital property when a reasonable 
basis exists for doing so. Massey v. Massey, 807 S.W.2d 391, 398 (Tex. 
App.—Houston [1st Dist.] 1991), writ denied, 867 S.W.2d 766 
(Tex. 1993). This court will correct the trial court's division of marital 
property only when an abuse of discretion has been shown. Murff, 615 
S.W.2d at 698; Massey, 807 S.W.2d at 398. It is this court’s duty to 
consider every reasonable presumption in favor of the proper exercise of 
discretion by the trial court in dividing the community estate. Murff, 
615 S.W.2d at 698; Massey, 807 S.W.2d at 398.
        To 
determine whether a trial court abused its discretion, we must decide whether 
the trial court acted without reference to any guiding rules or principles; in 
other words, whether the act was arbitrary or unreasonable. See Carpenter v. 
Cimarron Hydrocarbons Corp., 98 S.W.3d 682, 687 (Tex. 2002); Downer v. 
Aquamarine Operators, Inc., 701 S.W.2d 238, 241-42 (Tex. 1985), cert. 
denied, 476 U.S. 1159 (1986). Merely because a trial court may decide a 
matter within its discretion in a different manner than an appellate court would 
in similar circumstances does not demonstrate that an abuse of discretion has 
occurred. Downer, 701 S.W.2d at 241-42.
        Under 
an abuse of discretion standard, legal and factual sufficiency are relevant 
factors in assessing whether the trial court abused its discretion. Beaumont 
Bank v. Buller, 806 S.W.2d 223, 226 (Tex. 1991); Zeptner, 111 S.W.3d 
at 734. They are not, however, independent grounds of error. Ditraglia v. 
Romano, 33 S.W.3d 886, 889 (Tex. App.—Austin 2000, no pet.); Crawford 
v. Hope, 898 S.W.2d 937, 940 (Tex. App.—Amarillo 1995, writ denied).
Waste of Assets, Fiduciary Duty, and Fraud
        Appellant 
argues that the trial court abused its discretion by failing to divide the 
community estate of the parties in a just and right manner. This argument is 
based primarily on appellant’s contention that she conclusively established 
that appellee breached fiduciary duties he owed to her as his wife, committed 
constructive fraud, and wasted significant community assets. Appellant asserts 
that the trial court erroneously found that she failed to prove these claims by 
a preponderance of the evidence.
        Appellant 
contends that appellee committed waste of the assets in the community estate. 
The Texas Supreme Court has recognized waste of community assets as a factor to 
be taken into consideration in the division of the community estate. Schlueter 
v. Schlueter, 975 S.W.2d 584, 589 (Tex. 1998); see also Harper v. Harper, 
8 S.W.3d 782, 783-84 (Tex. App.—Fort Worth 1999, pet. denied). However, while 
one spouse's fraud on the community estate could justify an unequal division of 
the estate, “there is no independent tort cause of action for wrongful 
disposition by a spouse of community assets.” Schlueter, 975 S.W.2d at 
589.[1]
        In 
Schlueter, Mrs. Schlueter filed for divorce, complaining that her husband 
had diverted $12,565 in cash and an emu business worth $10,000 to his father to 
avoid having these assets included in the community estate. Id. at 586. 
The jury found that Mr. Schlueter had defrauded the community estate and the 
trial court rendered judgment that the community recover $12,850 from Mr. 
Schlueter and his father, jointly and severally, that Mrs. Schlueter recover 
$30,000 in punitive damages and $18,500 in attorney fees from her husband, and 
$15,000 punitive damages from her father in law. Id. The court of appeals 
affirmed. Schlueter v. Schlueter, 929 S.W.2d 94 (Tex. App.—Austin 
1996), rev'd, 975 S.W.2d 584 (Tex. 1998). The Texas Supreme Court 
reversed, holding that one spouse's fraud on the community estate could justify 
an unequal division of the estate but that there is no independent tort cause of 
action for wrongful disposition of community assets by a spouse. 975 S.W.2d at 
589-90.
        In 
addition to waste, appellant complains that appellee breached his fiduciary duty 
to her and committed fraud. A fiduciary duty exists between a husband and a wife 
regarding the community property controlled by each spouse. Zieba v. Martin, 
928 S.W.2d 782, 789 (Tex. App.—Houston [14th Dist.] 1996, no writ) 
(op. on reh'g); In re Marriage of Moore, 890 S.W.2d 821, 827 (Tex. 
App.—Amarillo 1994, no writ). “Fraud on the community” is a judicially 
created concept based on the theory of constructive fraud and is applied when 
there is a breach of a legal or equitable duty, which violates this fiduciary 
relationship existing between spouses. Zieba, 928 S.W.2d at 789; Moore, 
890 S.W.2d at 827. Although not actually fraudulent, any such conduct in the 
marital relationship is termed fraud on the community because it has all the 
consequences and legal effects of actual fraud since the conduct tends to 
deceive the other spouse or violates marital confidences. Zieba, 928 
S.W.2d at 789; Moore, 890 S.W.2d at 827.
        A 
presumption of constructive fraud arises where one spouse breaches the fiduciary 
duty owed to the other spouse and disposes of the other spouse's one-half 
interest in community property without the other's knowledge or consent. Zieba, 
928 S.W.2d at789; Jackson v. Smith, 703 S.W.2d 791, 795 (Tex. 
App.—Dallas 1985, no writ). When that occurs, the burden of proof is on the 
disposing spouse to show fairness in disposing of community assets. Zieba, 
928 S.W.2d at 789; see also Morrison v. Morrison, 713 S.W.2d 377, 379 
(Tex. App.—Dallas 1986, writ dism'd); Horlock v. Horlock, 533 S.W.2d 
52, 55 (Tex. Civ. App.—Houston [14th Dist.] 1975, writ dism'd). The 
court may consider three factors in considering a claim of constructive fraud: 
“(1) the size of the gift in relation to the total size of the community 
estate; (2) the adequacy of the remaining estate; and (3) the relationship of 
the donor to the donee.“ Zieba, 928 S.W.2d at789 (citing Horlock, 
533 S.W.2d at 55).
        Appellant 
presented evidence at trial that appellee made the following expenditures out of 
community funds without appellant’s knowledge or consent:
 
        •      $64,732.32 
on a Lexus for his girlfriend Ashley;
        •      approximately 
$30,000 in down payments on cars for appellee’s sister, mother, and brother;
        •      $145,809.33 
to pay Ashley’s medical bills;
        •      $78,436.56 
to Ashley’s mother, primarily for child care for appellee and Ashley’s 
child, but also including $6,548.68 in payments made before the child’s birth;
        •      $75,000 
for the option to buy a house appellee had leased for Ashley and himself;
        •      $82,550 
in payments to appellee’s mother;
        •      $118,745.38 
[$70,000 + $48,745.38] in gifts or loans to other members of appellee’s 
family;
        •      approximately 
$145,000 on hotels and airfare for trips that appellant did not go on, including 
trips involving Ashley and her family;
        •      $38,800 
on Rolex watches later sold to teammates;
        •      approximately 
$105,500 in checks and cash advances to himself that he could not account for.

  
        Appellee 
testified at trial and admitted to making many of these expenditures. Ashley 
also testified that appellee had paid her medical bills.
        Courts 
look with disfavor upon gifts by the husband to “strangers” of the marriage, 
particularly of the female variety. Osuna v. Quintana, 993 S.W.2d 201, 
209 (Tex. App.—Corpus Christi 1999, no writ). The court in Osuna 
observed:
  
It is so repugnant to our 
sense of justice that this court will never sanction the proposition that a 
husband may desert his lawful wife, and while living in adultery with another 
woman, donate to the latter as a gift his wife's interest in the property owned 
by them in common.
 
                . 
. . .
 
. . . . Money spent on another 
woman out of community property during the marriage requires an accounting to 
the community. This type of gift or expenditure amounts to fraud upon the 
community estate.

  
Id. at 208-09 
(citations omitted). The fact that many of appellee’s expenditures were made 
for the benefit of Ashley conclusively establish a breach of fiduciary duty and 
constructive fraud. See Zeiba, 928 S.W.2d at 789-90 (holding that because 
husband’s expenditures out of community funds on paramours constituted breach 
of fiduciary duty and waste, the community estate was entitled to reimbursement 
for those funds).
        Appellant 
also established that the expenditures were made without her knowledge and 
consent. After such a showing, a presumption of constructive fraud arises and 
the burden shifts to appellee to show fairness in disposing of community assets. 
Id. at 789; see also Morrison, 713 S.W.2d at 379; Horlock, 
533 S.W.2d at 55. Appellee presented no evidence that the expenditures were fair 
to appellant or that she consented to them. By failing to show the fairness of 
the expenditures, appellee failed to rebut the presumption of constructive fraud 
that arises when one spouse disposes of the other spouse’s one-half interest 
in community property without their knowledge or consent. See Zieba, 928 
S.W.2d at 789. Therefore, we hold that the evidence conclusively establishes 
that appellee breached his fiduciary duty to appellant, and committed fraud on 
the community. The trial court’s findings to the contrary are not supported by 
the evidence.
        Regardless, 
under the holding in Schlueter, claims of fraud, waste, and breach of 
fiduciary duty cannot be brought as separate tort claims of action in a divorce 
proceeding. 975 S.W.2d at 589. However, such claims are properly considered when 
dividing a community estate. Id. Therefore, the trial court should have 
ruled against appellant on her independent claims of waste, breach of fiduciary 
duty, and fraud and the exemplary damages relating to those claims as a matter 
of law, rather than based on insufficient evidence.
        Appellant 
argues that the adverse findings regarding her independent causes of action for 
breach of fiduciary duty, fraud, and waste, indicate that the trial court did 
not consider these matters or the evidence to support them in its division of 
the community estate.[2]  However, the trial 
court expressly “found” that it considered fraud on the community and waste 
in awarding appellant a disproportionate amount of the community estate. 
Appellee contends that regardless of the trial court’s negative findings as to 
the independent causes of action, the trial court clearly took into account 
fraud and waste when dividing the community estate. We agree with appellee that 
the trial court clearly considered these factors in its division of the 
community estate, as evidenced by the resulting disproportionate award in favor 
of appellant and the trial court’s express statement in its findings that it 
considered waste and fraud in making the award.
        Appellee 
argues that the above factors, among others, resulted in the disproportionate 
property award in favor of appellant. In his argument, appellee claims the trial 
court awarded eighty-three percent of the community estate to appellant. He asks 
this court to include $412,932.87 in temporary support received and not spent by 
appellant before the divorce in estimating that she received eighty-three 
percent of the community estate. He ignores the fact that they each received 
$70,500 per month of temporary spousal support, but that appellee spent all of 
his portion. His argument is flawed because he spent all of the temporary 
support he received, whereas, appellant saved some of hers. The trial court 
agreed with appellant when it determined that any money received by the spouses 
under temporary awards should be credited to each parties’ estate. We do not 
think that appellee should be allowed to inflate appellant’s percentage of the 
award by taking into account her share of the temporary support and omitting 
appellee’s share from consideration. Therefore, in calculating the portion of 
the community estate awarded to appellant, the trial court correctly omitted the 
$412,932.87 of temporary support saved by appellant during her separation and 
awarded to her in the divorce.
        According 
to the property values listed in appellant’s amended inventory and 
appraisement and in the divorce decree, the trial court awarded appellant 
accounts totaling $677,254.78 ($1,090,187.65 if we include the $412,932.87 of 
temporary support saved by appellant during her separation). Additionally, the 
trial court awarded appellant a money judgment against appellee in the amount of 
$110,000. The trial court also awarded appellant the Pennsylvania home worth an 
estimated $840,000, but with a mortgage of approximately $770,000, leaving a net 
equity of approximately $70,000. Appellant also got the Porsche with an 
estimated value of $64,500, but with a balance owed of $34,834.44, equaling a 
net equity of $29,665.56. She therefore received, in cash and net equity, 
approximately $886,920.34 (if we include the $412,932.87 of temporary support 
appellant saved, the total is $1,299,853.21).[3]
        The 
trial court awarded appellee accounts totaling $96,891.10, the leased property 
in Texas, his retirement accounts valued at $40,991.42, and cars with equity 
totaling over $100,000.[4]  However, since 
appellee received and spent his half of the temporary support prior to the 
divorce, he was not awarded that money in the divorce. Therefore, in calculating 
the percentage of the community estate awarded to appellant, the remaining 
balance of $412,932.87 of temporary support saved by appellant should not be 
included. Thus, the community estate totaled approximately $1,141,894.73; 
appellant received approximately seventy-seven percent of the community estate 
and appellee received twenty-three percent.
        In 
its findings, the trial court stated that it considered the following factors in 
making a disproportionate award in favor of appellant: (1) fault in the break up 
of the marriage; (2) fraud on the community; (3) benefits the innocent spouse 
may have derived from the marriage; (4) disparity of earning power; (5) 
appellant’s education and employability; (6) community liabilities; (7) tax 
consequences; (8) earning power of spouses; (9) need for future support; (10) 
nature of the property; (11) waste of community assets; (12) community funds to 
purchase out-of-state property; (13) gifts to or by the spouses during marriage; 
(14) reimbursement; (15) attorney’s fees; (16) creation of community property 
by the effort of the spouses. As we noted above, consideration of these factors 
by the trial court resulted in a disproportionate award in favor of appellant of 
seventy-seven percent.
        Texas 
law requires that an effort be made to reconcile conflicts in findings of fact. First 
Fin. Dev. Corp. v. Hughston, 797 S.W.2d 286, 294 (Tex. App.—Corpus Christi 
1990, writ denied). This same rule has been applied to conflicts between 
findings of fact and conclusions of law. Hartford Ins. Co. v. Jiminez, 
814 S.W.2d 551, 551-52 (Tex. App.—Houston [1st Dist.] 1991, no 
writ). In reconciling findings of fact, conclusions of law, and the judgment 
when two possible interpretations exist, the interpretation should be chosen 
that will harmonize the judgment with the findings of fact and conclusions of 
law upon which it is based. Grossnickle v. Grossnickle, 935 S.W.2d 830, 
841 (Tex. App.—Texarkana 1996, writ denied).[5]
        To 
obtain reversal of a judgment based upon an error in the trial court, the 
appellant must show that (1) the error occurred; and (2) it probably caused 
rendition of an improper judgment, or probably prevented the appellant from 
properly presenting the case to the appellate court. TEX. R. APP. 
P. 44.1(a); In re D.I.B., 988 S.W.2d 753, 756 n.10 (Tex. 1999); Tex. 
Dep’t of Human Servs. v. White, 817 S.W.2d 62, 63 (Tex. 1991). Here, the 
trial court’s insufficiency fact findings on appellant's individual tort 
actions appear to conflict with its finding that it took the fraud and waste 
factors into consideration in making the property division. The disproportionate 
findings for appellant, however, clearly show that the trial court’s judgment 
is based upon the later findings, not former. Therefore, the trial court's 
insufficiency findings regarding appellant's tort claims are superfluous. 
Because those findings were unnecessary they did not result in an improper 
judgment and do not require a reversal of the divorce decree. See Tex. R. App. P. 
44.1(a). Consequently, we hold that the trial court did not abuse its discretion 
in making a seventy-seven to twenty-three percent division of the community 
estate.
Toronto Blue Jays Contract
        In 
the second portion of her argument, appellant complains that the trial court 
erred in characterizing the post-divorce payments, under appellee’s contract 
with the Toronto Blue Jays, as appellee’s separate property because the trial 
court failed to properly determine when appellee acquired the right to be paid 
under the contract. On August 31, 2000, appellee filed for divorce. He signed 
the Blue Jays contract on February 19, 2001, and it was effective March 12, 
2001, when the office of the commissioner of major league baseball approved it. 
The parties were divorced on April 30, 2002.
        Appellant 
contends that the employment contract was clear and unambiguous and may be 
interpreted as a matter of law. See Coker v. Coker, 650 S.W.2d 391, 393 
(Tex. 1983) (stating that interpretation of a written contract is a matter of 
law if the contract is clear and unambiguous). Appellant’s briefing focuses on 
the question of whether the contract was a guaranteed contract. She argues that 
as a guaranteed contract, the payment rights under it accrued when it was 
signed, not when services were performed. She contends that the trial court 
erred by entering findings of fact numbered twelve, thirteen, fourteen, and 
fifteen.[6]  Appellant argues that the trial 
court’s interpretation of the contract was erroneous because it did not give 
full effect to all the provisions of the contract, imposed a condition precedent 
where none existed, and ignored the circumstances surrounding the contract.
        In 
contrast, appellee contends that the contract was guaranteed only to the extent 
that the baseball club promised to pay appellee his salary if he was otherwise 
willing and able to perform the services under the contract and was not in 
breach, even if the club no longer used the player’s services. Appellee argues 
that the club was not obligated to pay him if he refused to perform under the 
contract. He offered evidence to show that in major league baseball, a 
non-guaranteed contract means that the club is not obligated to pay the player 
when they no longer use his services. In contrast, a guaranteed contract 
obligates the club to pay the player even if they decide not to use his 
services. Appellee claims that under either type of contract the player is 
required to perform in order to receive payment.
        Findings 
of fact are usually reviewed under traditional legal and factual sufficiency 
standards of review. However, in this case the trial court’s characterization 
of the contract payments for 2002 were based solely upon the trial court’s 
interpretation of the contract. When an appellate court concludes that contract 
language can be given a certain or definite meaning, then the language is not 
ambiguous, and the appellate court is obligated to interpret the contract as a 
matter of law. DeWitt County Elec. Coop., Inc. v. Parks, 1 S.W.3d 96, 100 
(Tex. 1999); Coker, 650 S.W.2d at 393. A contract is not ambiguous merely 
because parties to an agreement have different interpretations of a term or 
phrase. DeWitt, 1 S.W.3d at 100; Forbau v. Aetna Life Ins. Co., 
876 S.W.2d 132, 134 (Tex. 1994) (op. on reh'g). A contract is ambiguous only if, 
after the application of established rules of construction, an agreement is 
still susceptible to more than one reasonable meaning. Dewitt, 1 S.W.3d 
at 100; Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd., 940 S.W.2d 
587, 589 (Tex. 1996).
        If 
the meaning of language used in a written agreement becomes uncertain when 
applied to the subject matter of the contract, the contract is latently 
ambiguous. Birmingham Fire Ins. Co. v. Am. Nat’l Fire Ins. Co., 947 
S.W.2d 592, 603 (Tex. App.—Texarkana 1997, writ denied); see Nat'l Union 
Fire Ins. Co. v. CBI Indus., Inc., 907 S.W.2d 517, 520 (Tex. 1995) (op. on 
reh'g). Although the determination of whether a contract is ambiguous should be 
limited to an examination of the language of the agreement, appellate courts may 
examine extrinsic evidence of “surrounding circumstances” or “the subject 
matter of the contract” to determine if a latent ambiguity exists. Birmingham 
Fire Ins. Co., 947 S.W.2d at 603. Courts must favor an interpretation that 
affords some consequence to each part of the instrument so that none of the 
provisions will be rendered meaningless. Coker, 650 S.W.2d at 394. After 
reviewing the contract in the present case, we hold that the language of the 
contract is not ambiguous, and we will interpret it as a matter of law.
        The 
contract at issue is comprised of a Uniform Player’s Contract (UPC) and an 
addendum between the Toronto Blue Jays and appellee. The addendum begins by 
stating that it “shall be deemed to amend and modify any provisions of, or 
rules or regulations governing, the UPC inconsistent herewith.” The UPC 
contract provides that “[f]or performance of the Player’s services and 
promises hereunder the Club will pay Player the sum of [$]4,000,000.00 (Four 
Million dollars) for 2001, and $5,800,000.00 (Five Million Eight Hundred 
Thousand Dollars) for 2002.” According to the UPC, the money was to be paid to 
appellee in semimonthly installments beginning at the start of the championship 
season and terminating at the end of the season.
        Under 
the addendum, the club was to pay appellee an additional $500,000 signing bonus. 
However, the club was relieved of its obligation to make any further payments to 
appellee—and was entitled to reimbursement of the signing bonus—if appellee 
failed, refused, or was unable to report to 2001 spring training for any reason 
other than death or disability. The addendum also provided for his base salary 
and award bonuses.
        Section 
D of the addendum is entitled “GUARANTEE.” Under section D, the “Club and 
Player agree that Player’s base salary for the 2001, and 2002 Major League 
Championship Seasons is ‘guaranteed’ in the manner and under the terms and 
conditions set forth below.” The contract goes on to list the circumstances 
under which the club is relieved of its guarantee to pay appellee’s base 
salary: (a) voluntary retirement; (b) labor dispute; (c) placement on any of the 
lists set out in Major League Rule 15; (d) suspension by the club; (e) 
intentional self-injury or suicide; (f) use of illegal drugs, misuse of 
prescription drugs, or alcohol dependency; (g) engaging in any inherently 
dangerous act or sport (e.g.: skydiving); (h) incapacity due to an allegation 
that player engaged in a criminal act; (i) HIV or AIDS; and (j) refusal to 
render services. Under section D, the payment is still guaranteed, however, 
if the “[c]ontract is terminated because Player fails . . . to exhibit 
sufficient skill or competitive ability to qualify or continue as a member of 
[the] Club,” even in the case of death or physical or mental incapacity 
incurred on or off the baseball field, before, during, or after the season.
        Regardless 
of the above, the contract provides that the obligation to continue payments 
beyond the date of termination will cease if the player’s death or physical or 
mental incapacity is due to: (1) intentional self injury; (2) use of illegal 
drugs, misuse of prescription drugs, or alcohol dependency; (3) engaging in an 
inherently dangerous act, activity, or sport; (4) the player’s own criminal 
act; or (5) incapacity due to the HIV virus or AIDS. The club also has the right 
under the addendum to convert the guaranteed contract into a non-guaranteed 
contract in the event that the club discovers that the player is not in first 
class physical condition due to the use of illegal drugs, misuse of prescription 
drugs, or alcohol dependency. Additionally, the player is required to complete 
physical examinations, by a doctor so the club can obtain insurance on the 
player. If the player refuses to cooperate with the examinations the guarantee 
is null and void.
        An 
expert on the characterization and valuation of major league baseball contracts, 
Kathy Kinser, testified for appellant at trial. Kinser testified that 
appellee’s contract was the most guaranteed contract that she had ever seen. 
She noted that, of all the guaranteed contracts that she had reviewed, only 
appellee’s contract guaranteed him payment regardless of whether the club 
allowed him to play or not. According to Kinser, most guaranteed contracts only 
provide that the player will be paid a portion of his salary if the club 
determines that he will not play.
        Appellee’s 
agent, Anthony Cabral, also testified regarding the contract. According to 
Cabral, who negotiated the contract for appellee, the contract is only 
guaranteed if the player is otherwise willing to perform skilled services as a 
baseball player.
        The 
trial court found that appellee was required to render skilled services in order 
to receive the future payments under the contract. In its findings of fact, the 
trial court stated that appellee “was being employed to render his skilled 
services as a major league baseball player” and that appellee would be paid, 
“for performances of the Player’s services,” the sum of $5,800,000 for the 
year 2002 baseball season. Under section D, Paragraph 1(j) of the addendum, the 
trial court found that the club was relieved of its guarantee to pay appellee if 
there was “any refusal by player to render his services.” Thus, the trial 
court determined that appellee was required to render his services as a skilled 
baseball player as a condition precedent to being paid.
        The 
trial court also found that in the event appellee was ever unconditionally 
released during the 2002 season from his obligation to perform services pursuant 
to section D, under paragraph two of the addendum, the remaining payments would 
be awarded sixty percent to appellant and forty percent to appellee. Even so, if 
appellee was not unconditionally released, the payments to appellee after the 
date of divorce “are not, and shall not be, divided as community property.”
        Appellant 
contends that the trial court’s interpretation is too narrow and fails to give 
full effect to the parties’ intentions. Appellant argues that the trial 
court’s interpretation of the contract ignores the plain language of the 
contract that states that the club “guarantees to pay” appellee “in full 
all payments” unless two contingencies arise: (1) the contract is terminated, 
or (2) appellee does not render his services due to the reasons listed in 
subparts (a) through (j). Appellant interprets the contingencies as exceptions 
to the guarantee of payment.
        Appellant 
also finds error in the trial court’s reliance on subpart (j).[7]  Appellant contends that the plain meaning of subpart 
(j) dictates that the guarantee would not apply if appellee refused to render 
his services. Appellant notes, however, that there are numerous situations where 
appellee would be paid even though he would not be rendering his services, such 
as if he were hospitalized for an injury. Thus, appellant reasons that paragraph 
one, subpart (j), does not require appellee to render services before being 
entitled to payment. Additionally, appellant argues that under the trial 
court’s interpretation of the contract, the post-divorce payments constitute 
community property only if appellee is unconditionally released from his 
obligation to render services; otherwise, the payments are considered separate 
property.
        The 
Texas Constitution defines separate property as a spouse's real or personal 
property owned before marriage or acquired during marriage by gift, devise, or 
descent. Tex. Const. art. XVI, § 
15. Community property consists of property other than separate property that is 
acquired by either spouse during the marriage. Tex. Fam. Code Ann. § 3.002 (Vernon 
1998); McClary v. Thompson, 65 S.W.3d 829, 834 (Tex. App.—Fort Worth 
2002, pet. denied). However, when separate property produces income, and that 
income is acquired by a spouse during marriage, it is community property. McClary, 
65 S.W.3d at 834. Whatever is acquired during marriage by the talent, toil, or 
other measure of productivity of either spouse is community property. Id.; 
Winger v. Pianka, 831 S.W.2d 853, 857 (Tex. App.—Austin 1992, writ 
denied). Thus, any spouse's personal income during marriage is community 
property. McClary, 65 S.W.3d at 834; Maben v. Maben, 574 S.W.2d 
229, 232 (Tex. Civ. App.—Fort Worth 1978, no writ).
        “Generally, 
whether property is separate or community is determined by its character at 
inception.” Barnett v. Barnett, 67 S.W.3d 107, 111 (Tex. 2001). 
Inception occurs when a party first has a right of claim to the property, i.e., 
when title is finally vested. McClary, 65 S.W.3d at 834; Smith v. 
Smith, 22 S.W.3d 140, 145 (Tex. App.—Houston [14th Dist.] 2000, 
no pet.) (op. on reh'g); Winkle v. Winkle, 951 S.W.2d 80, 88 (Tex. 
App.—Corpus Christi 1997, writ denied); see also McCurdy v. McCurdy, 
372 S.W.2d 381, 383 (Tex. Civ. App.—Waco 1963, writ ref'd) (refusing to adopt 
apportionment formula to determine character of a life insurance policy as 
community or separate property, and, instead, holding that the 
inception-of-title rule applied). Thus, a spouse is not entitled to a percentage 
of his or her spouse's future income after divorce. Smith v. Smith, 836 
S.W.2d 688, 692 (Tex. App.—Houston [1st Dist.] 1992, no pet.). A spouse is 
only entitled to a division of property that the community owns at the time of 
the divorce. Id.
        Notwithstanding 
these principles, appellant cites multiple cases in support of the proposition 
that under Texas law, contingent interests in property constitute community 
property if the interests are acquired during marriage. However, these cases are 
distinguishable from the case at bar, because they all dealt with either 
unvested stock options or retirement benefits. See Cearley v. Cearley, 
544 S.W.2d 661, 663-66 (Tex. 1976), abrogated by, Shanks v. Treadway, 110 
S.W.3d 444 (Tex. 2003); Busby v. Busby, 457 S.W.2d 551, 552-54 (Tex. 
1970); Boyd v. Boyd, 67 S.W.3d 398, 410-11 (Tex. App.—Fort Worth 2002, 
no pet.) (all holding that pension/retirement benefits were community property 
and subject to division upon divorce); see also Kline v. Kline, 17 S.W.3d 
445, 446 (Tex. App.—Houston [1st Dist.] 2000, pet. denied); Charriere 
v. Charriere, 7 S.W.3d 217, 219 (Tex. App.—Dallas 1999, no pet.); Bodin 
v. Bodin, 955 S.W.2d 380, 381 (Tex. App.—San Antonio 1997, no pet.) (all 
holding that unvested stock options were community property divisible upon 
divorce). We agree with appellant that Texas law is well settled regarding the 
characterization of retirement benefits and stock options as community property 
when they are accrued during marriage but paid after divorce. However, in the 
case at bar we are not dealing with either. Regardless, appellant makes an 
analogy to the above cases and argues that, under the present contract, the 2002 
payments were fixed property rights subject to divestment only under certain 
circumstances. We disagree, and hold that appellee was required to perform his 
services as a skilled baseball player before he was entitled to payment under 
the contract. Thus, the remaining payments under the contract constitute future 
earnings and as such are appellee’s separate property except under the limited 
circumstance found by trial court, as discussed herein.
        Other 
cases have characterized future earnings similarly. In Cunningham v. 
Cunningham, the appellate court affirmed the trial court’s judgment 
denying the wife any community interest in commissions the husband received 
after the divorce, regardless of the fact that the commissions stemmed from 
insurance policies written by the husband during marriage. 183 S.W.2d 985, 986 
(Tex. Civ. App.—Dallas 1944, no writ). The court reasoned that although the 
commissions related to services performed during marriage, the right to them did 
not accrue until the policies were renewed. Id. Moreover, the agency’s 
employment contract dictated that the spouse would not be entitled to payment 
unless he remained in the active service of the company. Id. Therefore, 
the community estate had only a mere expectancy of the renewal commissions, not 
a vested right at the time of divorce. Id.
        In 
Butler v. Butler, the court held that the wife was not entitled to an 
award of half the husband’s future earnings from his psychological counseling 
business after the divorce. 975 S.W.2d 765, 768 (Tex. App.—Corpus Christi 
1998, no pet.). There, the court awarded half of the fixtures, furniture, 
inventory, and all personal property associated with the husband’s sole 
proprietorship to the wife as community property in the divorce. Id. However, 
the court held that the husband’s future income, which would be derived from 
the husband’s psychological counseling business after the divorce, was not 
property acquired during marriage. Id. Thus, the future earnings 
of the husband were his separate property. Id.
        Appellant 
also cites Licata v. Licata to support the proposition that the character 
of personal earnings depends on when the earnings accrue, not when the earnings 
are received. 11 S.W.3d 269, 278-79 (Tex. App.—Houston [14th Dist.] 
1999, no pet.). While we agree with this general statement of the law, we 
disagree with appellant’s contention that appellee’s right to payment under 
the contract accrued when he signed it, rather than when he performed his 
services.
        A 
condition precedent is an event that must happen or be performed before a right 
can accrue to enforce an obligation. Centex Corp. v. Dalton, 840 S.W.2d 
952, 956 (Tex. 1992). To determine whether a condition precedent exists, the 
intention of the parties must be ascertained. Criswell v. European Crossroads 
Shopping Ctr., Ltd., 792 S.W.2d 945, 948 (Tex. 1990) (op. on reh'g). To 
determine the intent of the parties, we must look at the entire contract as a 
whole. Id.; Hudson v. Wakefield, 645 S.W.2d 427, 430 (Tex. 1983); Gallup 
v. St. Paul Ins. Co., 515 S.W.2d 249, 251 (Tex. 1974) (stating that the 
strongest indication of what a contract requires is determined by what its words 
plainly state). In order to make performance specifically conditional, a term 
such as “if”, “provided that”, “on condition that”, or some similar 
phrase of conditional language must normally be included. Criswell, 792 
S.W.2d at 948.
        After 
a thorough review of the contract at issue, it is clear that it was the intent 
of the parties that appellee render skilled services as a baseball player in 
exchange for the payment of $5,800,000 for the year 2002. The contract’s 
guarantee provision cannot be construed to excuse appellee from performance of 
his obligations under the contract. To the contrary, it existed to provide 
appellee with financial security in the event that appellee sustained an injury 
or the ball club decided that his services were no longer needed. It did not 
excuse his performance under the contract. We hold that appellee’s right to 
payment under the contract did not accrue until he performed his services. 
Therefore, the payments due under the contract after the date of divorce were 
correctly characterized as appellee’s separate property and were not subject 
to divestment by the trial court except under the limited circumstances set out 
in the fact findings. Appellant’s sole point is overruled.
TEMPORARY ORDERS ON APPEAL
        Appellee 
has filed a motion to modify the temporary orders that have remained pending 
during the course of the appeal. Because of our disposition of this cause on 
appeal, appellee’s motion to modify is now moot. Therefore, we deny 
appellee’s motion to modify.
CONCLUSION
        Having 
overruled appellant’s sole point of error and denied appellee’s motion to 
modify, we affirm the trial court’s judgment in its entirety.
 

  
                                                                  TERRIE 
LIVINGSTON
                                                                  JUSTICE

  
PANEL A: CAYCE, C.J.; 
LIVINGSTON and WALKER, JJ.
 
DELIVERED: March 11, 2004


NOTES
1.  
We note that the Schlueter holding is limited to claims based on waste of 
community assets, fraud on the community estate, and related punitive damages. See 
Schlueter, 975 S.W.2d at 589.
2.  
Under Schlueter, appellant could not recover on these independent claims, 
but the trial court could properly consider appellee’s wrongful conduct when 
dividing the community estate. 975 S.W.2d at 589.
3.  
We note that appellant’s brief states that appellant received a net equity of $843,000, but appellant then 
proceeds to subtract the $770,000 mortgage and the debt on the Porsche at 
$34,834.44. However, by our calculations, the mortgage and the debt were 
subtracted before arriving at appellant’s total net equity. Appellant’s 
method subtracts the mortgage and debt twice.
4.  
Certain values were omitted in appellee’s amended inventory and appraisement 
regarding a ninety-nine green Navigator given to appellee’s brother, so zero 
dollars of equity were included in our calculation for that car.
5.  
Where an abuse of discretion standard of review applies to a trial court’s 
ruling, findings of fact and conclusions of law, while helpful, are not 
required. Samuelson v. United Healthcare, Inc., 79 S.W.3d 706, 710 (Tex. 
App.—Fort Worth 2002, no pet.); Crouch v. Tenneco, Inc., 853 S.W.2d 
643, 649 (Tex. App.—Waco 1993, writ denied) (op. on reh’g).
6.  
In these findings, the trial court determined that the appellee was required to 
render his services as a skilled baseball player as a condition precedent to 
being paid.
7.  
Subpart (j) provides:
Club 
guarantees, in the event that this Contract is not terminated, to pay Player in 
full payments stipulated in paragraph B, provided, however, that Club shall be 
relieved of its guarantee to pay Player’s Base Salary during any limited 
period that player does not render his services under the Contract due to . . . 
Any refusal by Player to render his services not listed above.